F I L E D
Clerk
District Court

FEB 18 2022

for the Northern Mariana Islands
By _____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| UNICORN CORPORATION | Case No. 1:20-cv-00014 |
| Plaintiff, | |
| vs. | **ORDER GRANTING<br>ENTRY OF DEFAULT JUDGMENT<br>AGAINST DEFENDANT FORSON<br>HOLDINGS (CNMI), LLC** |
| FORSON HOLDINGS (CNMI), LLC, | |
| Defendant. | |

Before the Court is Plaintiff Unicorn Corporation's ("Unicorn") motion for entry of default judgment in this diversity action against Defendant Forson Holdings (CNMI), LLC ("Forson"). (Mot., ECF No. 12.) Prior to a hearing on the motion, Forson made an appearance and moved to set aside the entry of default. (Appearance of Counsel, ECF No. 18; Mot. to Set Aside Default, ECF No. 19.) The Court held a hearing on August 24, 2021, and after hearing arguments from both parties, the Court denied Forson's motion to set aside, granted Unicorn's motion for default judgment in part as to its request for declaratory and injunctive relief to have Forson remove its remaining assets, and took Unicorn's request for damages under advisement to allow the parties to submit supplemental information. (Min., ECF No. 20.) Defendant Forson filed its supplemental response on August 30, 2021 (ECF No. 21), and Plaintiff Unicorn filed its reply to Forson's supplemental on September 21, 2021 (ECF No. 28.) Having reviewed the record, evidence presented, and relevant case law, the Court GRANTS Unicorn's motion for default judgment, but for the lesser amount of **$1,712,082**, plus attorney's fees and costs and post-judgment interest at the applicable federal rate.

## I.   FACTUAL BACKGROUND

The following facts are taken from Unicorn's First Amended Complaint (First Am. Compl. "FAC", ECF No. 8) as well as from facts established from the default judgment hearing and supplemental evidence.

On February 26, 2016, Mrs. Gab Du C. Chong entered into a two-year sublease agreement with Defendant Forson Holdings (CNMI), LLC through its representative Cai Lingli regarding Lot 030 B 21 in Tanapag, Saipan (the "Property") containing an area of 20,156 square meters, more or less, with the option to extend in four one-year increments through written notice. (FAC ¶¶ 8, 11–12, 14–15.) Before filing this lawsuit, Mrs. Chong assigned her leasehold interest in the Property to Unicorn Corporation, of which she owns a fifty percent share. (*Id.* ¶¶ 18-19.) The Property at issue contained four 5,000 square foot barracks; a 50,000 square foot warehouse; and two two-story apartment complexes with six units each.[1] (*Id.* ¶ 10.) Rent was $25,000 per month, to be due on the first day of each month, but Chong agreed to waive rent for the first six months of the sublease in exchange for Forson's promise to repair existing damages to the Property caused by Typhoon Soudelor. (*Id.* ¶¶ 20, 22.) Forson took possession of the Property the day after (*id.* ¶ 17), and has since paid the total of $450,000, or for 18 months of rent, due under the sublease for the two-year term—although not always on time (*id.* ¶ 30).

---

[1] The First Amended Complaint alleges an additional 50,000 square foot factory. (FAC ¶ 10.) However, based on the scope of work, photo evidence of the premises presented at the hearing (Ex. C), and Mrs. Chong's own testimony at the hearing, the Court finds that there was only one (not two) 50,000 square foot building.

The sublease expired on February 27, 2018, and Forson never extended its option to extend the sublease. (*Id.* ¶¶ 32, 38.) However, since then and to date of the motion hearing on August 24, 2021, Forson occupied the Property and has not paid any rent since its holdover tenancy. (*Id.* ¶ 39.) Forson continued to store heavy equipment, generators, and lodging and house furnishing on the Property. (*Id.* ¶ 40.) Mrs. Chong through counsel sent her first written notice to Forson on April 25, 2018 seeking damages and outlining Forson's holdover tenancy, and Forson attempted to negotiate a new sublease under another entity that ended up not being fruitful. (*Id.* ¶ 42.) Mrs. Chong's attorney then sent a second notice to Forson on October 2, 2018 notifying it of its holdover status, demanding $200,000 in rent for its holdover period from March to October 2018 to be paid by October 5, and notifying that Forson's failure to vacate within fifteen days could result in double rent and attorney's fees and costs, but to no avail. (*Id.* ¶¶ 44–45.) A third notice was sent on April 10, 2019, including demanding payment for Forson's damages to the Property. (*Id.* ¶¶ 48-50.) This lawsuit commenced the following summer.

At the default judgment motion hearing, Forson conceded that it was a holdover tenant from March 2018 until about November 2018, but disputes being a holdover for the periods thereafter. Forson's witness, Jesse Aquiningoc, construction site manager of Imperial Pacific International (CNMI), LLC ("IPI"), testified that the Property was used to store construction materials during the lease period and for a few months after the lease period ended, but that after May 2018, about 98 percent of the construction materials were cleared. What remained were a few beds, a generator, and two pile drivers. Mrs. Gab Du Chong herself testified that on or about October 2018, she had to put a padlock on the main gate of the road to prevent theft, but that she

never prevented Forson from access and would open the gate whenever Forson asked. Typhoon Yutu then caused devasting damage to Saipan sometime around late October 2018, and Forson argues that this led to erosion to a part of the road providing access to the Property. Mr. Aquiningoc testified that he saw the erosion of the road sometime in November 2018 and noticed that part of the road collapsed and had running water in the area; thus the pile drivers could not be removed because a heavy equipment vehicle needed to transport the large pile drivers would get stuck there. Despite the pile drivers remaining on a portion of the Property, Mrs. Chong testified that for about 12 months during Forson's holdover period, she was able to lease a portion of the Property to Primary Source, a Colorado Company, for $3,000 per month to store vehicles during the recovery period after Typhoon Yutu.

Additionally, as of the date of the filing of the complaint and even up until the default judgment hearing, Forson never made any repairs to the property as promised. (FAC ¶ 55.) Instead, Forson caused damages to the Property, in violation of Section 9 of the sublease (Ex. 1) requiring the leaseholder's consent prior to demolishing any structure or removing any existing improvements. These damages include demolishing several walls to create a massive entrance for heavy equipment; ripping off existing floor tiling to the bare concrete; cutting all electrical wiring; and removing light fixtures, installed ducts, several doors, windows, and multiple air conditioners. (*Id*. ¶¶ 35-36; 75-76.) Forson conceded to the fact that it demolished parts of the Property and conceded that it owes damages to Unicorn for necessary repairs at the default judgment hearing, but Forson disputes the cost of repairs.

\

## II.  PROCEDURAL HISTORY

On July 1, 2020, Plaintiff Unicorn Corporation filed a complaint in this Court against Defendant Forson under (1) the Commonwealth of the Northern Marianas ("CNMI") Holdover Tenancy Act and for (2) breach of contract. (Compl., ECF No. 1.) Given issues over service (ECF Nos. 2-3), Unicorn did not properly serve Forson through its registered agent until November 2020 (Proof of Service, ECF No. 4).

On March 24, 2021, Unicorn moved for entry of default for Forson's failure to answer or otherwise plead pursuant to FRCP 55(a).  (ECF No. 6.)  However, because Unicorn failed to adequately plead diversity jurisdiction, the Court *sua sponte* dismissed the complaint without prejudice for lack of jurisdiction.  (ECF No. 7.) Unicorn filed its amended complaint on April 8, 2021 to correct the jurisdictional issue. (FAC, ECF No. 8.)  In its prayer for relief, Unicorn seeks declaratory and injunctive relief from this Court in the form of a decree that Unicorn is entitled to take immediate possession of the Property pursuant to 2 CMC § 40208 and a writ pursuant to 2 CMC § 40210 describing the Property and commanding that the person the writ is directed to remove all persons from the Property and put Unicorn in possession. (*Id.*) Unicorn also seeks damages for: (1) the rental amount for Forson's holdover (which as of April 8, 2021 total $950,000), as well as double rent pursuant to 2 CMC § 40205 beginning October 5, 2018 when Forson refused to vacate; (2) cost of repairs in the amount of $738,923; (3) attorney's fees and costs pursuant to 2 CMC § 40209; (4) pre-judgment interest to be determined by the Court; and (5) post-judgment interest at 9 percent per year. (*Id.*)

After Forson failed to answer or otherwise plead to the First Amended Complaint, Unicorn filed a second motion for entry of default pursuant to Federal Rule of Civil Procedure 55(a) on May 18, 2021. (ECF No. 10.) A couple days later, the Clerk entered default against Forson. (Entry of Default, ECF No. 11.) Unicorn subsequently moved for default judgment on July 13, 2021 pursuant to Federal Rule of Civil Procedure 55(b)(2) ("Motion," ECF No. 12), and the Court set the matter for a default judgment hearing on August 4, 2021 (Order Setting Hearing, ECF No. 13). The hearing was continued twice to August 24, 2021 upon Unicorn's motions for continuances. (ECF No. 17.) On the eve before the default judgment hearing, counsel Joey San Nicolas made his entry of appearance on behalf of Forson (ECF No. 18) and moved the Court to set aside the entry of default pursuant to Federal Rule of Civil Procedure 55(c) (ECF No. 19).

### A. Forson's Motion to Set Aside Entry of Default

The Court addressed the motion to set aside entry of default prior to proceeding with the default judgment hearing and denied Forson's motion. In doing so, the Court considered the three disjunctive factors articulated in *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984)—(1) whether the plaintiff will be prejudiced, (2) whether the defendant has a meritorious defense, and (3) whether culpable conduct of the defendant led to the default. The Court found that Forson failed to show any excusable neglect when Forson, through its authorized agent, was notified of the complaint against it at least by April 2021 (ECF No. 9), and only made an appearance four months later on the eve of the default judgment hearing. Furthermore, Forson conceded that it continued to occupy the Property after the expiration of the lease without making any payments and therefore did not

have a meritorious defense. For these reasons and those stated on the record, Forson's motion to set aside the entry of default was denied. (Min., ECF No. 20.)

**B. Unicorn's Motion for Default Judgment**

As for the motion for default judgment, the Court—after hearing arguments from counsel for both parties, and testimony from Unicorn's president, Mrs. Gab Du Chong, and Forson's witness, Jesse Aquiningoc—granted Unicorn's request for declaratory and injunctive relief. Specifically, the Court declared that Unicorn was entitled to immediate possession of the property and ordered Forson to remove its remaining items on the Property within 30 days. However, the Court took the matter regarding damages under advisement, and permitted Forson to file an opposition to Unicorn's scope of work on the cost of repairs.

Having considered the undisputed facts in the First Amended Complaint, the evidence received at the hearing, relevant case law, and the parties' submissions regarding the scope of work, the Court now issues its decision regarding the damages owed as follows.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) provides for default judgment by the Court. Under Rule 55(b)(2), default judgment is not a matter of right, and the Court has discretion to enter default judgment following an entry of default. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). The Ninth Circuit has set forth the following factors ("*Eitel* factors") for courts to consider in exercising their discretion:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning

material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

Upon entry of default, the well-pleaded factual allegations of the complaint are taken as true, with the exception of allegations concerning the amount of damages. *See Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977). The scope of relief is limited to the specific demand in the complaint. *See* Fed. R. Civ. P. 54(c); *Alabado v. French Concepts, Inc.*, 2016 WL 5929247, at *3 (C.D. Cal. May 2, 2016). Therefore, a defendant may oppose a default judgment by challenging the legal sufficiency of the complaint. *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Conceptually, then, a motion for default judgment is like a reverse motion to dismiss"). If default judgment is granted, the plaintiff must establish damages with reasonable certainty. *Same Day Garage Door Services v. Y.N.G. 24/7 Locksmith LLC*, 2020 WL 1659913, at *3 (D. Ariz. Apr. 3, 2020) ("'As a general rule, damages which result from a tort must be established with reasonable certainty . . . . Damages are not rendered uncertain because they cannot be calculated with absolute exactness, yet, a reasonable basis for computation must exist.'" (quoting *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993))).

## IV. DISCUSSION

### A. <u>Whether the Court has jurisdiction over Unicorn's Holdover Tenancy Act claim</u>

As a preliminary matter, the Court *sua sponte* addresses the issue as to whether it has subject matter jurisdiction over Unicorn's Holdover Tenancy Act claim, despite diversity in citizenship and Unicorn meeting the threshold amount of over $75,000. *See Snell v. Cleveland,*

*Inc.*, 316 F.3d 822, 826 (9th Cir. 2002) (noting that pursuant to Federal Rule of Civil Procedure 12(h)(3), a court "may raise the question of subject matter jurisdiction, sua sponte, at any time during the pendency of the action."). The Court raises this issue because some district courts have held that they lacked subject matter jurisdiction over landlord and tenant eviction disputes because of the summary proceedings nature of those matters. *See Summary Proceeding*, Black's Law Dictionary (11th ed. 2019) (defining "summary proceeding" as "[a] nonjury proceeding that settles a controversy or disposes of a case in a relatively prompt and simple manner.").

In *Glen 6 Associates, Inc. v. Dedaj*, 770 F. Supp. 225, 229 (S.D.N.Y. 1991), for example, the district court judge concluded that it lacked jurisdiction over eviction actions. It reasoned that "[i]n diversity cases the federal court applies the substantive law of the forum state but the federal laws governing procedure," and that a summary process "by its very nature," however, "differs greatly from the plenary civil trials governed by the federal rules." *Id*. at 227 (citations omitted). It noted, for example, that in New York, the summary process is based on a petition with no formal pleadings required, requires no period of notice for hearings, and contains no provision for discovery—in contrast to the Federal Rules of Civil Procedure requiring formal pleadings, service of summons and complaint, and longer periods for notice, as well as containing detailed provisions for discovery and motions. *Id.* at 228. Accordingly, the district court concluded that it lacked jurisdiction because "there is no authorization for summary adjudication of rent and possession actions contained within the Federal Rules of Civil Procedure or authorized by any other statute governing federal court procedures." *Id*. Other jurisdictions also followed suit with the same reasoning. *See, e.g., CPG Fin. I, L.L.C. v. Shopro, Inc.*, 2006 WL 744275, at *2-3 (W.D. Mo. Mar.

22, 2006) (remanding case back to state court pursuant to 28 U.S.C. § 1447(c) and noting that Missouri's summary proceeding provisions required no formal pleadings, permitted short notice, and contained nothing regarding discovery or trial by jury).

Other courts, however, have held the contrary. In *MCC Mortgage LP v. Office Depot, Inc.*, 685 F. Supp. 2d 939, 945 (D. Minn. 2010), the district court distinguished Minnesota's eviction statute from the limited nature of the eviction proceedings under other state laws to conclude that that it had jurisdiction over plaintiff's eviction claim. Specifically, the court noted that under Minnesota eviction statutes, actions are commenced by a complaint, the defendant must be served with a summons, the defendant may file an answer, either party may demand trial by jury, and any losing party may appeal. *Id*. at 946 (citations omitted). While the actions are resolved in a short time frame, continuances are permitted, and thus summary eviction proceedings are handled in the same fashion as other civil actions. *Id*. (citations omitted). The Court therefore determined that it had jurisdiction over the matter. *Id.; see also Forty Six Hundred LLC v. Cadence Ed., LCC*, 478 F. Supp. 3d 84, 86 (D. Mass. 2020) (denying jurisdiction challenge where "the summary proceedings created by the state legislature carry many of the hallmarks of plenary civil litigation—the filing of a complaint, service of process, discovery, opportunity for a jury trial, etc.—albeit on an accelerated schedule."); *Safeway, Inc. v. Sugarloaf P'ship, LLC,* 423 F. Supp. 2d 531, 535-36 (D. Md. 2006) (noting that "the presence of different or more expeditious procedures in state court is not a reason to deny the existence of federal diversity jurisdiction."); *Mut. First, Inc. v. O'Charley's of Gulfport, Inc.*, 721 F. Supp. 281, 282 (S.D. Ala. 1989) ("A state court's jurisdiction to hear an unlawful detainer action has never been held to be exclusive.").

The CNMI Holdover Tenancy Act similarly contains the hallmarks of plenary civil litigation—except on an accelerated schedule. For example, the statute requires the filing of a complaint, 2 CMC § 40206(a); requires service of summons and complaint on the defendant, § 40207(a); permits a defendant to file an answer and counterclaim, § 40206(a); permits discovery by order of the court and postponements by stipulation or good cause shown, § 40206(b), permits both parties to demand jury trial, § 40206(c); and provides an opportunity for an appeal, § 40206(e)—but all on an expedited basis.  Thus, the CNMI's eviction statutes are more analogous to Missouri's statutes discussed in *MCC Mortgage LP* and Massachussett's in *Forty Six Hundred LLC*, such that this Court concludes that it has subject matter jurisdiction over Unicorn's Holdover Tenancy Act claim. *See MCC Mortg.*, 685 F. Supp. 2d at 945; *Forty Six Hundred LLC*, 478 F. Supp. 3d at 86.

However, even if this Court has subject matter jurisdiction, it must determine whether it should abstain. Federal courts should exercise discretion to abstain from deciding a case when "difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 801 (9th Cir. 2001). "By abstaining in such cases, federal courts . . . avoid both unnecessary adjudication of federal questions and needless friction with state policies." *Id*. at 801–02 (internal quotations and citation omitted). This doctrine, though, is a "narrow exception" to the court's duty to decide cases before it, and federal courts are not required to abstain because it does not implicate subject matter jurisdiction. *Id*. at 801.

Despite this narrow exception, some district courts have abstained from exercising jurisdiction over eviction claims. In *Glen 6 Associates, Inc. v. Dedaj*, the district court in the Southern District of New York also exercised abstention and remanded the case back to state court, reasoning that:

> Landlord/tenant disputes concerning failure to pay rent and compliance with local health ordinances do not implicate, in any way, federal rights. Moreover, the state of New York has, through its legislature and its courts, developed a system of administering its law governing possession of real estate which is both fair and efficient. Where state court adjudication of a dispute based upon predominantly local factors is available to the parties, intervention of a federal court is not necessary, particularly when no federal right is at risk.

770 F. Supp. at 228. The court also reasoned that landlord and eviction law is unsettled and everchanging, such that abstention will increase assurance of uniformity of law. *Id*. at 229. Moreover, permitting removal of eviction cases to federal courts would overburden the federal system given the numerous types of these cases filed in state courts. *Id*. Other courts have also abstained given the evolving nature of landlord/tenant disputes. *See Forty Six Hundred LLC*, 478 F. Supp. at 87 ("[W]hile the Court recognizes that, under normal circumstances, 'the questions of state law presented in this case' would not be considered 'novel,' 'landlord/tenant law is continually evolving' in the wake of the COVID-19 pandemic, and the Court is sensitive to the fact that the state courts may choose to fashion exceptions to eviction proceedings which this Court cannot yet anticipate."); *MRM Mgmt. Co. v. Ali*, 1997 WL 285043, at *1 (E.D.N.Y. May 27, 1997) (abstaining from exercising subject matter jurisdiction based on principles of comity and federalism).

In contrast, other district courts have declined to abstain. In *MCC Mortgage LP*, the District Court of Minnesota declined to abstain, reasoning that abstention is an exception and that abstention in the case would require piecemeal litigation given counterclaims asserted in the matter than could not be litigated in a summary eviction proceeding. 685 F. Supp. at 947. In *Safeway, Inc.*, likewise, the District Court of Maryland there did not abstain, in part because the case did not "implicate a complicated statutory scheme" but rather "hinge[d] on straightforward questions of contract interpretation." 423 F. Supp. 2d at 537.

Akin to the matter in *Safeway, Inc.,* Unicorn's claim under the CNMI Holdover Tenancy Act does not implicate any complicated statutory scheme, but merely requires "straightforward" contract interpretation and factual determinations in applying the law. Furthermore, given that abstention is a "narrow exception" to the court's duty to decide cases before it, the Court declines to abstain from this matter. The Court will therefore proceed with the motion for entry of default judgment.

**B. Whether the *Eitel* factors support entry of default judgment**

As noted previously, the Ninth Circuit considers the following factors in determining whether entry of default judgment proper:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel*, 782 F.2d at 1471–72. The Court will thus determine whether the *Eitel* factors support entry

of default judgment in this matter.

### (1) Possible Prejudice to Plaintiff

The first *Eitel* factor asks if plaintiff would suffer prejudice if default judgment is not entered. Courts have construed the failure to appear or participate as precluding recourse for recovery. *See Construction Laborers Tr. Funds for Southern California Admin. Co. v. Anzalone Masonry, Inc., et al.*, 316 F. Supp. 3d 1192, 1198 (C.D. Cal. 2018). Here, although Forson appeared at the very last minute to oppose the entry of default and default judgment, Forson ultimately acknowledged that it was a holdover tenant from May 2018 until November 2018, and that even at the time of the hearing, two large pile drivers remained on the Property. Forson thus conceded to liability but disputes the damage owed. The Court thus finds that Unicorn is prejudiced if default judgment is not entered, because its Property would remain occupied and used without any payment.

### (2) Merits of Plaintiff's substantive claims and (3) sufficiency of the complaint

"The Ninth Circuit has suggested that these two factors require that a plaintiff 'state a claim on which the [plaintiff] may recover.'" *PepsiCo, Inc. v. California Security Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002) (quoting *Kloepping v. Fireman's Fund*, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996)). These two factors are the most important. *Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019).

The question is whether these allegations state a claim upon which relief may be granted. Rule 8 of the Federal Rules of Civil Procedure requires that a Plaintiff provide a "short and plain statement" of his entitlement to relief, so as to put a Defendant on notice of the claim and allow

him or her to answer or otherwise respond appropriately. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *id*. at 570). In other words, the complaint must include facts permitting the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

Here, Unicorn does properly plead claims under the CNMI Holdover Tenancy Act, 2 CMC 40201, *et seq.*, and breach of contract. Under the CNMI Holder Tenancy Act:

> a tenant "may be removed from the premises" when the tenant continues in the possession of the premises, without the permission of the landlord, after one of the following: (a) the expiration of the lease; (b) any default in the payment of rent pursuant to the lease, where the landlord has served three days' notice in writing on the tenant; (c) failure to cure a material breach of the lease, other than nonpayment of rent, where the landlord has served 15 days' written notice on the tenant.

*Klingsberg v. Wheat*, Civil No. 06-0082, Order Granting Motion to Set Aside Plaintiffs' Filings at 4 (N. Mar. I. Commw. Super. Ct., May 25, 2006) (citing Holdover Tenancy Act, 2 CMC § 40204). Section 40206 of the Act provides that the landlord or his/her attorney may apply for the removal of any tenant by filing a complaint "stating the facts which authorize the removal of the tenant, and describing the premises[.]" 2 CMC § 40206(a). Here, Unicorn's amended complaint states at least two bases for removal, in that it alleges that: (1) Forson has been a holdover since the end of the two-year sublease term of February 27, 2018, and (2) Unicorn gave notice on October 2, 2018

as required by the Act for payment within three days and Forson failed to do so. (FAC ¶¶ 56-58.) The amended complaint also describes the Property as Lot 030 B 21 in Tanapag, Saipan, CNMI, containing an area of 20,156 square meters, more or less, and containing a 50,000 square foot warehouse, four 5,000 square foot barracks, and two two-story (six units each) apartment complexes.  (*Id.* ¶¶ 8-10.)

As to the breach of contract claim, establishing a claim for breach of contract in the CNMI requires demonstrating: "(1) the existence of a valid contract; (2) the breach of an obligation imposed under the contract; and (3) damage to the plaintiff resulting from the breach." *Pac. Rim Land Dev., LLC v. Imperial Pac. Int'l (CNMI), LLC*, No. 1:19-cv-00016, 2020 WL 1942454, at *5 (D. N. Mar. I. April 23, 2020). Unicorn's complaint mentions the date of the written sublease agreement, some of the terms, and identities of those who signed it; identifies the specific provision (Section 9) that Forson breached by damaging the Property and removing fixtures; and alleges the approximate amount of damages of $738,923. (FAC ¶¶ 8-12, 20-22, 69-80.) Therefore, these two factors weigh in favor of default judgment. Moreover, the fact that Forson conceded to liability at the default judgment hearing reinforces that this factor supports judgment in favor of Unicorn.

*(4) Sum of money at stake in suit*

The sum of money at stake must be balanced against the seriousness of the offense. *Anzalone Masonry, Inc.*, 316 F. Supp. 3d at 1201. "The amount at stake must not be disproportionate to the harm alleged." *Id.* If it is, such as where the sum of money requested is too large or unreasonable, default judgments are disfavored. *Id.*

16

Unicorn in its amended complaint seeks at least $950,000 in rental amount owed and $738,923 in costs for repairs, although it admitted during the default judgment hearing that some of that amount is mitigated, plus whatever pre and post judgment interest permitted by law and attorney's fees and costs. Although these amounts are somewhat large and weighs against entry of default judgment, Forson conceded that it owes damages but merely disputes the final amount. Furthermore, the Court allowed Forson an opportunity to present evidence to refute Unicorn's claimed damages, and therefore any judgment amount awarded here are based on evidence presented by both parties. The facts on this particular factor thus favor the entry of default judgment.

(5) *Possible disputes concerning material facts, (6) whether default is due to excusable neglect, and (7) Strong policy of deciding decisions on the merits*

Where "[d]efendants have not participated in the litigation at all, the first, fifth, sixth, and seventh [*Eitel*] factors are easily addressed." *Trident Inv. Partners Inc. v. Evans*, 2021 WL 75826 at *2 (D. Ariz. Jan. 8, 2021). Failure of a defendant to appear suggests that there is no genuine issue of material fact. *See Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."). The same is true for excusable neglect. *Laser Spine Inst., LLC v. Playa Advance Surgical Inst., LLC*, 2020 WL 5658711, *4 (C.D. Cal. Sept. 23, 2020) ("There is little possibility of excusable neglect where a defendant fails to appear and respond . . . " (internal quotation and citation omitted)).

Given Forson's failure to appear, the fifth and sixth factors weigh in favor of entry of default judgment. Moreover, as to the sixth factor, Forson on the eve of the default judgment hearing moved to vacate the entry of default, in which it argued excusable neglect. The Court in addressing Forson's motion, however, found that Forson failed to show any excusable neglect when Forson through its authorized agent was notified of the complaint against it at least by April 2021, and yet Forson failed to take any actions until the very last minute.

The seventh factor generally weighs against default judgment, given that cases "should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. "[T]his preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation marks omitted). Here, Forson conceded to liability but disputes the damages; this reinforces that the seventh factor weighs in favor of judgment for Unicorn.

Thus, overall the *Eitel* factors weigh in favor of the entry of default judgment. The Court will therefore proceed to analyzing whether Unicorn is entitled to the damages it seeks.

**C.    Declaratory and Injunctive Relief**

In its request for relief, Unicorn seeks (1) a decree that Unicorn is entitled to take immediate possession of the Property pursuant to 2 CMC § 40208, and (2) a writ pursuant to 2 CMC § 40210 describing the Property and commanding that the person the writ is directed to remove all persons from the Property and put Unicorn in possession.

Under the CNMI Holdover Tenancy Act, if plaintiff prevails, then "judgment shall be entered that he recover possession of the premises." 2 CMC § 40208. "After entry of judgment in favor of plaintiff the clerk shall issue a writ describing the premises and commanding the officer

to whom the writ is directed to remove all persons from the premises, and put plaintiff in possession." 2 CMC § 40210.

Given Forson's concession that it still had personal property remaining on the premises at issue and its nonobjection to Unicorn receiving immediate possession of the Property, the Court at the August 24, 2021 hearing ordered that Unicorn be entitled to take immediate possession of the Property pursuant to 2 CMC § 40208, and ordered that Forson remove its remaining personal property within 30 days or else it would be deemed abandoned.[2] (Min., ECF No. 21.) While the Court recognizes that the parties have since stipulated twice for an extension of time for the removal of Forson's personal property (*see* ECF Nos. 26, 30), the Court expects Forson to have complied with the Court's order.

**D.  Damages**

As to damages, Unicorn seeks damages for: (1) the rental amount for Forson's holdover, as well as double rent pursuant to 2 CMC § 40205 starting when Forson refused to vacate beginning October 5, 2018; (2) cost for repairs from Forson's destruction to the Property; (3) attorney's fees and costs pursuant to 2 CMC § 40209; as well as (4) pre-judgment interest to be determined by the Court and post-judgment interest at 9 percent per year. (*Id*.)

*(1) Rent*

Unicorn seeks the rental amount for Forson's holder, as well as double rent pursuant to

---

[2] Given that Forson appeared at the proceeding, it was unnecessary for the Court to direct the Clerk to issue a writ and command the U.S. Marshals to remove the remaining personal property when Forson itself could remove them.

Section 40205 of the Holdover Tenancy Act starting when Forson refused to vacate beginning October 5, 2018.

The CNMI Holdover Tenancy Act permits monetary damages in favor of the plaintiff in addition to the award of possession of the property for "the amount of money found due, owing, and unpaid by the defendant, with costs." 2 CMC § 40208. Section 40205 provides for rental amounts under the Holdover Tenancy Act, specifically providing that:

> If the tenant holds over and continues in possession of the premises *or any part thereof* after termination of the rental agreement without the permission of the landlord, the landlord may recover possession of the premises in the manner provided in 2 CMC § 40206. The landlord *may* also recover double the amount of rent due on the premises, *or any part thereof*, for the period during which the tenant refuses to surrender possession.

2 CMC §40205 (emphasis added); *see also Camacho v. L&T Intern. Corp.*, 4 N.M.I. 323 ¶ 17 (N. Mar. I. 1996) ("A landlord who . . . chooses to recover possession of the premises is entitled to compensation for the use and occupation of the leased property during the holdover period at a rate based on the previous rental rate, or on the proven reasonable value independently established if that differs from the previous rental rate." (internal quotation and citation omitted)).

Here, Forson concedes that it was a holdover from March 2018 when the lease period ended until about November 2018, and therefore does not dispute that it owes Unicorn rent for this nine-month period that it was a holder. Under the sublease rate of $25,000 per month, this amounts to $225,000 in unpaid rent. However, Forson argues that for any period after November 2018, it was not a holdover due to impossibility. Namely, at the default judgment hearing, Forson provided testimonial evidence from Mr. Aquiningoc that due to the destruction from Typhoon Yutu, a

portion of the road that provided ingress and egress to the premises was eroded and partially collapsed, thereby making it impossible to allow a heavy equipment vehicle such as a low boy to remove the pile drivers. Starting May 2018, only a generator and the pile drivers remained. The generator was subsequently removed but not the pile drivers; Forson therefore disputes owing damages for any period thereafter given the impossibility of removing this heavy equipment vehicle.

The Court finds Forson's impossibility defense unpersuasive because even if the Court were to accept as true that natural causes were the reason for the collapse in the road, any impossibility of removing the vehicle was in large part due to Forson's own delay in removing the vehicle. The sublease ended on February 27, 2018, and Typhoon Yutu did not occur until October 21, 2018. Forson thus had more than seven months to remove all of its possessions from the Property, including the pile drivers, yet it delayed removal for months. Unicorn's written demand for payment of unpaid rent started in December 2017 and was repeated in April 2018 and again in October 2018. (*See* Ex. 2-4.) Forson failed to provide evidence that it took measures to try to remove the pile drivers before the road eroded, or even after the alleged erosion, including working with Unicorn and/or the government to address the issue. Rather, Forson ignored Unicorn's letters of demand.

Given that the CNMI Holdover Tenancy Act permits repossession and rent where the tenant "holds over and continues in possession of the premises *or any part thereof*," 2 CMC § 40205, the Court finds that Forson was a holder starting March 1, 2018 through August 24, 2021—the date the Court ordered immediate possession to Unicorn—for 42 months. Even though only a

generator and pile driver remained starting May 2018, Forson still possessed a part of the premises. Accordingly, Forson owes $1,050,000 to Unicorn for unpaid rent for 42 months.

As to Unicorn's request for double rent, the Court finds that it would be unjust and inequitable to require Forson to pay double of the entire rental amount starting October 2018 when it was only a holdover to a small portion of the premises. Therefore, the Court declines to award Unicorn double rent starting October 5, 2018.

Finally, evidence at the hearing established that Mrs. Chong during Forson's holdover period was able to lease a portion of the Property to Primary Source, a Colorado Company, for $3,000 per month to store vehicles for 12 months. The Court will therefore offset the amount Forson owes to Unicorn in rent by $36,000.

In sum, Unicorn is entitled to **$1,014,000** in damages for unpaid rent due to Forson's holdover tenancy.

*(2) Cost for repairs from Forson's destruction to the Property*

Unicorn also seeks general damages for repairs due to Forson's damages to the Property, in violation of Section 9 of the sublease agreement requiring the leaseholder's consent prior to demolishing any structure or removing any existing improvements. Unicorn alleges that Forson caused damages to the Property by demolishing several walls to create a massive entrance for heavy equipment; ripping off existing floor tiling to the bare concrete; cutting all electrical wiring; and removing light fixtures, installed ducts, several doors, windows, and multiple air conditioners. (FAC ¶¶ 35-36, 75-76.) At the default judgment hearing, Unicorn presented evidence of a Scope

of Work[3] dated June 25, 2018 completed by a contractor from Philippine Construction, estimating the costs to repair all damages on the premises. The cost of repairs was estimated at $738,923, although Unicorn conceded at the hearing that estimates for damages to the road ($150,000) should be deducted if the road at issue was in fact public property–resulting in an adjusted amount of $588,923 for repairs.

During the hearing, Forson acknowledged the fact that it demolished parts of the Property and conceded that it owed damages to Unicorn for necessary repairs, but Forson disputed the costs of repairs and requested that it be able to submit its own scope of work. The Court granted that request, and Forson filed its own response regarding the scope of work (ECF No. 21) with a declaration by IPI Assistant Vice President Eric Poon (Poon Decl., ECF No. 21-1) as well as other attachments (ECF Nos. 21-2 through 21-4) on August 30, 2021, arguing that the total costs of repairs should only be $256,097 based on estimates conducted by a team of IPI employees led by Poon and estimates for light fixtures from Hong Electric Hardware Store in Chalan Laulau, Saipan. Unicorn filed its own reply to Forson's response (ECF No. 28) with attachments (ECF Nos. 28-1 through 28-4) on September 21, 2021, arguing that the cost of repairs would be $705,272 based on estimates by Hector T. Sevilla, who is a General Contractor and owner of HTS Construction.[4] Unicorn also included a declaration from Mr. Sevilla. (*See* Sevilla Decl., ECF No. 28-4.)

---

[3] This was admitted as Exhibit 7 at the default judgment hearing.
[4] While Mr. Sevilla identified additional damages in approximately $220,000 (*see* ECF No. 28-3), the Court recognizes Unicorn's inference that those damages cannot be included as a part of any default judgment because they were not presented at the hearing or previously identified in the First Amended Complaint (*see* ECF No. 28).

Having reviewed the parties' submissions (ECF Nos. 21, 28) regarding the original scope of work's estimates (Ex. 7), the Court first notes that the Scope of Work is difficult to fully comprehend because the photos are not labeled, and the estimates do not direct to any particular photos. Unicorn's supplemental proposed repair work cost estimates and photos (Ex. 8, ECF No. 28-1) have some notations on the photos and so they appear to address Forson's objections. Based on a review of these submissions, the Court orders as follows.

**a)  Main Building**

    i.   *50,000 s.f. flooring - Damaged Tiles: $237,500.00.* Forson objects to this amount, arguing that their survey revealed that only 15,656 square feet vinyl tiles were damaged, and therefore pro-rated their estimates accordingly to $73,933. However, the Court agrees with Unicorn's assessment that a patchwork job of new tiles laid alongside old tiles is not acceptable, and that a complete repair to make the warehouse usable would require all tiles to be removed and replaced. The Court will award Unicorn $237,500 for this item.

    ii.   *Damaged opening door 10'x 12'0 = 2 sets. Cost of Labor and Materials: $10,040.00.* Given that Forson does not object to this amount, the Court will award Unicorn $10,040 for this item.

    iii.   *Damaged floor slab 5'-0 x 4'0 = 4 each total of 80 square feet. Labor and Materials: $1,400.00.* Given that Forson does not object to this amount, the Court will award Unicorn $1,400 for this item.

iv.   *Missing Light and Fixtures – Labor and Materials: $75,000.00.* Forson objects to this estimate, noting that IPI's inspection only found 245 missing light fixtures, and at $158 per fixture including labor, this would amount to $38,710. Unicorn notes that Mr. Sevilla counted 168 missing light fixtures, which is less than the number that Forson counts, but his estimates for repairs are $51,429. The Court recognizes that Forson's unit cost is based on a price quotation from a local hardware supply store for the lighting fixtures, plus assumed labor costs of $7.25 per hour for non-skilled labor and $10 per hour for skilled labor.  (ECF No. 21 at 1-2.) Unicorn's quotation on the other hand is from a general contractor who assessed it as of September 2021. (ECF Nos. 28-1, 28-4.) The Court adopts Unicorn's estimated repair cost, as it represents a more accurate market cost from a third party. Therefore, the sum of $51,429 will be awarded to Unicorn for this item.

v.    *Missing installed duct opening, 7 sets. Labor and Materials: $10,500.00.* Forson objects, arguing that IPI's review only found 6 sets of duct openings, and thus argues for the lower amount of $9,000. Unicorn in reply agrees with this assessment. The Court will therefore award Unicorn $9,000 for this item.

vi.   *Enclosed opening, 48 s.f.: $1,500.00.* Forson objects, arguing that it could not locate the enclosed opening. Unicorn notes that Mr. Sevilla

was able to locate the enclosed opening originally identified by the original engineer and agrees with the cost of repair. Given that two independent witnesses were able to locate this opening on the Property, the Court overrules Forson's objection and awards Unicorn the $1,500.00.

vii.    *Missing 16 doors, 7x6 opening, 672 square feet: $24,192.00.* Forson objects to this amount, noting that it counted 8 missing doors only and the cost should thus be adjusted to $12,096. Unicorn in reply agrees with this assessment. The Court will award Unicorn $12,096 for this item.

viii.    *Missing windows 3x4, 11 each: $3,342.00.* Forson argues that this estimate should be rejected because none of the windows were missing, as 9 windows were found at the Main Building and 6 missing windows were found at the office attached to the Main Building. Unicorn maintains that Mr. Sevilla did find those windows that IPI located, but they were removed and resting on the floor, broken. Given that the windows were removed and Unicorn also included images of the broken windows (*see* Ex. 8.9 and 8.10, ECF No. 28-1 at 9-10), the Court awards Unicorn $3,342 for this item.

ix.    *Broken door jamb office, 1 each: $750.00.* Given that Forson does not object to this amount, the Court will award Unicorn $750 for this item.

x.   *Damaged office ceiling: $10,500.00.* Given that Forson does not object
     to this amount, the Court will award Unicorn $10,500 for this item.

xi.  *Broken water line within the main building: $5,550.00.* Forson argues
     that this should be disregarded because it could not locate the broken
     water line. Unicorn maintains that Mr. Sevilla was able to locate the
     damaged water lines as shown by the photos in Ex. 8 and he agreed with
     the original estimates. (Ex. 8.13, 8.14, ECF No. 28-1 at 13-14.) First,
     the Court notes that Sevilla's damaged water line photos are, according
     to his descriptions, for the exterior of the barracks. (*Id*.) This estimate is
     for the main building's water line, which Sevilla's repair estimate
     describes it as the "[b]roken water line within the building." (Ex. 8, ECF
     No. 28-1 at 1.) The Court nevertheless finds Unicorn's position—that
     the main 50,000 s.f. building has a damaged water line—more credible.
     The images in the original scope of work estimates (Ex. 7 at 53-54)
     show a gutted-out warehouse building, and one of Sevilla's images (Ex.
     8.14) shows one staff toilet and bathroom space with broken water lines.
     These are convincing evidence that there are areas with cut, damaged
     water lines within the interior of the main building.  Accordingly, the
     Court overrules Forson's objection and grants Unicorn $5,550 for this
     broken water line.

27

xii. *Broken water tank cover: $2,350.00.* Given that Forson does not object to this amount, the Court will award Unicorn $2,350 for this item.

xiii. In sum, the Court will award Unicorn <u>$345,457</u> in repairs out of the $365,814 originally requested for the main building. (Ex. 7 at 2.)

**b) <u>Barracks No. 1</u>**

i. *Missing Door l each: $650.00.* Given that Forson does not object to this amount, the Court will award Unicorn $650 for this item.

ii. *Missing / Damage vinyl tiles 5,000 SF: $23,750.00.* Forson argues that this estimate should be disregarded because it only counted 4,302 square feet and noted that there were no indications that there were existing vinyl tiles before. In response, Unicorn included a photo from Mr. Sevilla (*see* Ex. 8.4, ECF No. 28-1 at 4) that depicts faint outlines of prior existing vinyl tiles and noted that Mr. Sevilla estimated 4,800 square feet of floor area needing tiling. Given the photo evidence and the revised lower total area calculated by Sevilla, the Court finds that there were existing vinyl tiles that were then removed and grants Unicorn 4,800 square feet for the sum of $23,749 based on Mr. Sevilla's estimates.

iii. *Painting / damage: $5,500.00.* Given that Forson does not object to this amount, the Court will award Unicorn $5,500 for this item.

iv.  *Damaged Wall & Window: $7,350.00.* Given that Forson does not object to this amount, the Court will award Unicorn $7,350 for this item.

v.   *Missing split type aircon 1 each: $2,350.00.* Forson argues that this estimate should be disregarded because there is no indication of an existing split type aircon or photos shown before conditions. In response, Unicorn attached photo evidence of metal bracing on the wall showing where a split type aircon would have been. (*See* Ex. 8.8, ECF No. 28-1 at 8.) To the extent Forson objects because it was not originally provided by Unicorn prior to Forson's tenancy, the Court agrees that Unicorn has not provided evidence that it provided this aircon unit at the commencement of the Sublease.   Accordingly, the Court will disregard this item.

vi.  *Missing of lights & Fixtures (lot): $2,375.00.* Forson objects on the basis that it counted 26 missing light fixtures and that with an estimate of $73 per light fixture including labor, the amount should be $1,898. Unicorn agrees in reply. The Court will therefore award Unicorn $1,898 for this item.

vii. In sum, the Court will award Unicorn $39,147 in repairs out of the $41,975 it originally requested (Ex. 7 at 2) and of the $41,497 adjusted total for Barracks No. 1 (ECF No. 28 at 6).

29

c) **Barracks No. 2**

    i. *Missing entrance door 5x7: $2,100.00.* Given that Forson does not object to this amount, the Court will award Unicorn $2,100 for this item.

    ii. *Missing Door 3x7: $750.00.* Given that Forson does not object to this amount, the Court will award Unicorn $750 for this item.

    iii. *Missing Service Door: $750.00.* Given that Forson does not object to this amount, the Court will award Unicorn $750 for this item.

    iv. *Missing Aircon Spilt Type: $2,400.00.* Forson argues that this estimate should be disregarded because there is no indication of an existing split type aircon or photos shown before conditions. Unicorn indicates that Mr. Seville found metal brackets on the wall showing where any split type aircon previously existed, similar to in Barracks No. 1, although no photo is included showing the metal brackets for Barracks No. 2. (Ex. 8.8, ECF No. 28-1.) For the same reason as the air conditioner unit for Barracks No. 1, the Court will sustain Forson's objection and disregard this item.

    v. *Missing Light & Fixtures (lot): $3,800.00.* Forson objects on the basis that it counted 26 missing light fixtures and that with an estimate of $73 per light fixture including labor, the amount should be $1,898. Unicorn agrees in reply. The Court will therefore award Unicorn $1,898 for this item.

vi. *Missing / Damage vinyl tiles 5,000 s.f.: $23,750.00.* Like with Barrack No. 1, Forson argues that this estimate should be disregarded because it only counted 4,302 square feet and noted that there were no indications that there were existing vinyl tiles before. In response, Unicorn included a photo from Mr. Sevilla (*see* Ex. 8.5, ECF No. 28-1 at 5) that depicts faint outlines of prior existing vinyl tiles and noted that Mr. Sevilla estimated 4,800 square feet of floor area needing tiling. Given the photo evidence, the Court finds that there were existing vinyl tiles that were then removed. Accordingly, Forson's objection is overruled in part. The Court awards Unicorn the lower total of 4,800 s.f. for the sum of $23,749 for the vinyl tiles.

vii. In sum, the Court will award Unicorn <u>$29,247</u> in repairs out of the $33,550 originally requested (Ex. 7 at 2) and revised sum of $31,647 (ECF No. 28 at 8) for Barracks No. 2.

**d)  <u>Barracks No. 3</u>**

i. *Damaged Door 6x8: $2,880.00.* Given that Forson does not object to this amount, the Court will award Unicorn $2,880 for this item.

ii. *Damaged Door 3x7x 12: $9,600.00.* Given that Forson does not object to this amount, the Court will award Unicorn $9,600 for this item.

iii. *Damaged windows 11 each x 6' by '4: $6,684.00.* Forson objects to this estimate, noting that it only counted 8 damaged windows and thus the

estimate should be adjusted to $4,864. Unicorn in its reply agrees. The Court will therefore award Unicorn $4,864 for this item.

iv.  *Damaged Ceiling (lot): $5,350.00.* Given that Forson does not object to this amount, the Court will award Unicorn $5,350 for this item.

v.  *Damaged vinyl tiles 5,000 s.f.: $23,750.00.* Forson argues that this estimate should be disregarded because it only counted 4,302 square feet and noted that there were no indications that there were existing vinyl tiles before. In response, Unicorn included a photo from Mr. Sevilla (*see* Ex. 8.7, ECF No. 28-1 at 7) that depicts faint outlines of prior existing vinyl tiles and noted that Mr. Sevilla estimated 4,800 square feet of floor area needing tiling. Mr. Sevilla's estimates were $23,749, similar to the original estimates. Given the photo evidence, the Court finds that there were existing vinyl tiles that were then removed. Accordingly, the Court overrules Forson's objection in part, and awards Unicorn the lower total area of 4,800 s.f. for the sum of $23,749.

vi.  In sum, the Court will award Unicorn <u>$46,443</u> in repairs out of the $51,744 originally requested (Ex. 7 at 2) and adjusted requested amount of $46,443 (ECF No. 28 at 9) for Barracks No. 3.

**e)  <u>Barracks No. 4</u>**

i.  *Damaged concrete wall: $3,800.00.* Given that Forson does not object to this amount, the Court will award Unicorn $3,800 for this item.

ii.   *Missing windows 7 each: $2,184.00.* Given that Forson does not object to this amount, the Court will award Unicorn $2,184 for this item.

iii.   *Missing Doors 7 each: $3,325.00.* Given that Forson does not object to this amount, the Court will award Unicorn $3,325 for this item.

iv.   *Missing Vinyl Tiles 5,000 s.f.: $ 23,750.00.* Forson objects and argues that there are only 2,470 square feet of damaged vinyl tiles, and therefore the amount should be adjusted to $11,732.50. However, the Court agrees with Unicorn's assessment that a patchwork job of new tiles laid alongside old tiles is not acceptable, and that a complete repair would require all tiles to be removed and replaced. Although Mr. Sevilla's review of the floor area revealed 4,800 square feet needing repairs, his estimates were $23,749—almost the same as the original estimates. The Court will award Unicorn $23,749 for this item.

v.   In sum, the Court will award Unicorn $33,058 in repairs out of the $33,059 originally requested for Barracks No. 4.

**f)   Two (2) Story Building – Ground Floor – BLDG. I**

i.   *Missing doors, 2 each: $950.00.* Forson objects on the ground that there are no missing doors. Unicorn in its reply agrees. The Court will therefore disregard this estimate.

ii.   *Missing A/C 2 each: $4,800.00.* Forson argues that this estimate should be disregarded because there is no indication of any existing aircons or

photos shown before conditions. Unicorn indicates that Mr. Sevilla found metal brackets on the wall showing where the missing aircons previously existed. Unicorn responded with a photo of where one missing aircon used to be located, not two. (*See* Ex. 8.6, ECF No. 28-1 at 6.) Nonetheless, the Court finds credible the submission of the two independent contractors who identified two missing air conditioners in this ground floor apartment complex. Moreover, given that this a housing complex, the Court finds that aircon units likely existed and were provided for by Unicorn prior to the commencement of the Sublease. Alternatively, if Forson purchased the aircons and then installed it, Section 10 of the Sublease provides that "any alteration and improvement made to existing structure on the Materially Improved Part remain on said Premises at the expiration and/or termination of the lease agreement in its good, operating condition." (See Ex. 1.) Thus, Forson was required to leave the improvement. Accordingly, the Court awards Unicorn $4,800 for the two missing air conditioner units.

iii.   *Crashed sliding door 8x7: $4,200.00.* Given that Forson does not object to this amount, the Court will award Unicorn $4,200 for this item.

iv.   *Missing sliding door 1 each: $1,475.00.* Given that Forson does not object to this amount, the Court will award Unicorn $1,475 for this item.

> > *v.* *Missing Vinyl Tiles 2,400 s.f.: $11,400.00.* Forson objects on the ground that it found only 1,677 square feet of damaged tiles, and therefore the adjusted amount should be $7,965.75. In reply, Unicorn noted that Mr. Sevilla only estimated 1,400 square feet needing repairs and estimated the repair cost at $6,650, which is lower than both the original estimate and Forson's estimate. The Court will therefore award Unicorn $6,650 for this item.
>
> > *vi.* In sum, the Court will award Unicorn <u>$17,125</u> in repairs out of the $22,825 originally requested for the Ground Floor, Building No. 1 (Ex. 7 at 2). Given that the original scope of work included a duplicate estimate for this same Ground Floor of Building No. 1 (*see* Ex. 7 at 3), the Court will not award any for the duplicate.

> **g)  1st Floor, BLDG. II**

> > *i.* *Missing Doors 1 each: $750.00.* Given that Forson does not object to this amount, the Court will award Unicorn $750 for this item.
>
> > *ii.* *Missing A/C 1 unit: $2,400.00.* Forson argues that this estimate should be disregarded because there is no indication of any existing aircon or photos shown before conditions. Unicorn indicates that Mr. Sevilla found brackets on the wall indicating where the missing aircon previously existed without providing any photo evidence of this. Although there is no photo identified by Unicorn or Sevilla to assist the

Court, there is still the representation from two independent contractors that viewed the evidence that there is one missing air conditioner unit. Furthermore, a photo of what appears to be an apartment unit shows there was likely a split type unit air conditioner above the sliding door. (Ex. 7 at 75.) That this was an apartment complex further reinforces that an aircon likely existed. If Forson alternatively installed the aircon, Paragraph 10 of the Sublease gives Unicorn a basis to claim it should remain with the premises. For these reasons, the Court overrules Forson's objection and grants Unicorn $2,400 for this missing unit.

    iii.   *Missing vinyl tiles 630 s.f.: $2,992.50.* Given that Forson does not object to this amount, the Court will award Unicorn $2,992.50 for this item.

    iv.   In sum, the Court will award Unicorn $6,142.50 in repairs for the first floor of Building No. 2.

**h)  2nd Floor, BLDG. II**

    i.   *Missing Doors 3x7 2 each: $950.00.* Given that Forson does not object to this amount, the Court will award Unicorn $950 for this item.

    ii.   *Missing A/C 2 each: $4,800.00.* Forson argues that this estimate should be disregarded because there is no indication of any existing aircons or photos shown before conditions. Unicorn fails to address this in its reply. However, the estimates from Mr. Sevilla remain at $4,800. (*See* ECF No. 28-1 at 3.) For the same reason as the prior claim for the

missing air conditioner, the Court overrules Forson's objection and awards Unicorn $4,800 for these items.

iii. *Missing Vinyl Tiles 150 s.f.: $712.50.* Given that Forson does not object to this amount, the Court will award Unicorn $712.50 for this item.

iv. In sum, the Court will award Unicorn $6,462.50 in repairs for the second floor of Building No. 2. The total for both floors of Building No. 2 is $12,605, the full amount of what Unicorn originally requested. (*See* Ex. 7 at 3.)

### i) <u>Other</u>

i. *Damaged Road 2,500 s.f.: $150,000.00.* Forson notes that this was removed on the record at the default judgment hearing given that the road was public property. Unicorn in response, however, indicates that Mr. Sevilla's review of maps indicates that the damaged road is private property. Unicorn thus reinstates the $150,000 request. Mr. Sevilla's declaration indicates that the "damaged existing concrete driveway leading up to the property at issue . . . is a private easement and not public property." (Sevilla Decl. ¶ 5, ECF No. 28-4.) The Division of Land and Survey parcel map that Unicorn included as Exhibit 9 (ECF No. 28-2) shows the concrete driveway leading up to Unicorn's Property as part of Lot 030 B 15. Unicorn has established that it has a leasehold interest in Lot 030 B 21 and appears to have a Lease

Agreement and Grant of Easement in Lot 030 B 15 for ingress and egress to and from the Property. (Ex. 1 at 1.) Moreover, evidence presented by Forson at the default judgment hearing depicted the damages to the concreted road as located within the gated property, which based on the parcel map, would make it fall within Lot 030 B 21, the Property that Unicorn leased to Forson. (Ex. A, B, C.) The Court therefore finds that the damaged road does fall within Unicorn's private property, and therefore Unicorn may properly reinstate this request. Moreover, the Court rejects any arguments by Forson that it was not the cause of the damage to the road. Testimonial evidence presented by Forson at the hearing indicated that the damages on the road were due to natural causes likely from Typhoon Yutu. However, the original scope of work prepared for Unicorn that included the repair estimate for the 2,500 square feet in damaged road was done on June 25, 2018, four months prior to Typhoon Yutu. Therefore, the Court rejects Forson's explanation that the road damage was caused by nature. Instead, the Court finds that Forson's extensive use of heavy equipment to the site is the more likely explanation. Unicorn's representative Mrs. Gab Du Chong testified that the warehouse was previously used as a garment factory. Mr. Aquiningoc from IPI testified that the Tanapag property adjacent to Unicorn's Property had barracks and a fabrication shop, and

together the properties were used as a part of IPI's casino construction project to store all construction materials during the sublease period. Mrs. Chong testified about seeing big dump trucks coming into the building after walls to the warehouse were broken down. In 2018, after the lease expired, Aquiningoc was tasked to remove all construction materials from Unicorn's Property and it took him three months to do so, and the remaining items were the pile drivers and a 400 KB generator, and some beds. That the pile drivers could only be carried by a lowboy trailer—meaning that the pile drivers were also moved into the Property with such vehicle—demonstrates that Forson used heavy equipment vehicles to transport objects to and from the Property, likely causing damage to the road. The fact that Forson was able to transport the pile drivers into the Property in the first place also highlights that the damaged road could not have been a pre-existing condition. Based on these facts, the Court finds in favor of Unicorn and awards it $150,000 for the repair of the damaged road.

ii.  *Damaged Water Line: $25,000.00.* Forson argues that this should be disregarded because on-site inspection did not reveal or locate any damaged water lines. However, Unicorn indicates that Mr. Sevilla was able to locate areas of damaged water pipes, evidenced by Exhibits 8.13 and 8.14 (ECF No. 28-1 at 13-14) which depict damaged water lines

outside the barracks and in the bathroom. The original scope of work dated June 2018 also depicts various damaged water lines. (*See* Ex. 7 at 8, 14, 33, 43-45). Given evidence of damages, the Court awards Unicorn $25,000 for this item.

iii.  *Damaged Water Tank Cover: $2,350.00.* Forson argues that this should be disregarded because on-site inspection did not reveal any damaged water lines. Unicorn indicates that Mr. Sevilla was able to locate the damages, as shown by Ex. 8.13 and 8.14. (ECF No. 28-1 at 13-14.) The Court, however, finds this claimed amount duplicative of the water tank cover estimate for the same $2,350 already included within the Main Building section, which Forson did not object to. The Court will therefore disregard this second claim for the damaged water tank cover.

iv.  In sum, the Court will award Unicorn <u>$175,000</u> for necessary repairs to the 2,500 s.f. damaged road and water lines.

These therefore add to a total damages amount of:

|  | Estimated Repair Costs |
|---|---|
| Main Building | $345,457 |
| Barrack No. 1 | $39,147 |
| Barrack No. 2 | $29,247 |
| Barrack No. 3 | $46,443 |
| Barrack No. 4 | $33,058 |
| Two Story - BLDG I. | $17,125 |
| BLDG II. | $12,605 |
| Other | $175,000 |
| **Total** | **$698,082** |

The Court finds that Unicorn is entitled to a total of $698,082 in general damages for cost of repairs due Forson's damages to the Property in violation of Section 9 of the sublease agreement.

(3) *Attorney's fees and costs*

Federal Rule of Civil Procedure 54(d) provides for costs for the prevailing party. As to attorney's fees, however, under the "American Rule: [e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Bakers Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015).

Unicorn concedes that the sublease agreement itself does not contain a provision for attorney's fees (FAC ¶ 28) but seeks attorneys' fees pursuant to 2 CMC § 40209. Section 40209 of the Holdover Tenancy Act provides that "the party in whose favor judgment or decree has been rendered may recover reasonable court costs, including attorney's fees, from the nonprevailing party." 2 CMC § 40209. Costs are also provided for under § 40208, which provides for money judgment against the defendant "for the amount of money found due, owing, and unpaid by the defendant, with costs." An award of such attorney's fees, however, is discretionary. *Jung v. Kim*, Civil No. 10-0314, Order Denying Defendants' Request for Attorney's Fees at 4 (N. Mar. I. Commw. Super. Ct., Jan. 29, 2013).

The Court nonetheless finds that an award of reasonable attorney's fees and costs is appropriate in favor of Unicorn given that Unicorn expended the time and costs in order to repossess its Property and has prevailed. *See id*. ("Given the purpose of the Act, the Legislature likely promulgated the provision on 'Costs and Attorney's Fees' as additional protection for landlords over holdover tenants."). At the default judgment hearing, counsel for Unicorn indicated

that it sought $4,200 in attorneys' fees. However, once the Court has determined that attorneys' fees and costs should be awarded, it must determine the reasonableness of the proposed amounts, and the burden is on the party requesting the fees to provide evidence to the entitlement of its requested amount. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008). Unicorn must therefore submit a petition for  attorney's fees and cost establishing its entitlement to its requested amount.

### (4) *Prejudgment and post judgment interest*

"In diversity actions, state law determines the rate of prejudgment interest, and postjudgment interest is governed by federal law." *AT&T Co. v. United Computer Sys., Inc*., 98 F.3d 1206, 1209 (9th Cir. 1996).

In the CNMI, "[n]o statutory authority exists in the Commonwealth for prejudgment interest rates,[5] but prejudgment interest may be provided for by contract." *Triple J Saipan, Inc. v. Ogo*, 2020 MP 15 ¶ 16 (N. Mar. I. 2020) (internal citation omitted). "In addition, courts may allow prejudgment interest as part of a damage award to compensate for detention of money or property even when interest is not stipulated for by contract or authorized by statute." *Manglona v. Baza*, 2012 MP 4 ¶ 23 (N. Mar. I. 2012) (citing *Manglona v. Commonwealth*, 2005 MP 15 ¶ 43 (N. Mar. I. 2005)). In *Manglona v. Government of the Northern Mariana Islands*, the Commonwealth Supreme Court discussed the proper analysis for prejudgment interest in the absence of controlling

---

[5] CNMI law does provide for a cap on pre-judgment interest amounts. Pre-judgment interest rates are capped at 1 (one) percent per month for any contractual principal amounts over $300.  4 CMC § 5301.

statutory law, and determined that because "none of our other statutory laws discussing interest rates are analogous enough to a prejudgment interest context to use them in setting the appropriate rate," it adopted the federal approach – namely, that an "award of prejudgment interest must be equitable and compensate a party for its actual losses." 2010 MP 10 ¶ 30 (N. Mar. I. 2010) (slip opinion). "Although a post-judgment interest statute may influence courts in determining the appropriate prejudgment interest award, . . . courts must consider the factual circumstances surrounding the contract, deciding the interest rate based on equity and the wronged party's actual losses." *Isla Dev. Property, Inc. v. Jang*, 2017 MP 13 ¶ 15 (N. Mar. I. 2017) (slip opinion). Because "[p]rejudgment interest serves to compensate for the deprivation of the money due from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury that damages are intended to redress," prejudgment interest is calculated "from the date of the loss or the date the complaint was filed to the date final judgment is entered." *Triple J. Saipan*, 2020 MP 15 ¶ 16 (internal quotations and citations omitted).

Here, the sublease agreement between Mrs. Chong and Forson is silent as to any interest at all, including prejudgment interest. The CNMI Holdover Tenancy Act also does not expressly provide for any prejudgment interest. The Court must therefore determine an interest rate that is "equitable and compensate[s] a party for its actual losses." *See Manglona*, 2010 MP 10 ¶ 30. Here, however, without any requested rate or any supporting evidence or case law establishing a reasonable rate, the Court is at a loss as to what prejudgment interest rate would compensate Unicorn for its actual losses due to Forson's holdover tenancy. Unicorn did not provide any evidence at the default judgment hearing demonstrating its entitlement to prejudgment interest.

Thus, if Unicorn is seeking prejudgment interest, it must submit supplement briefing establishing its entitlement to prejudgment interest at a specified rate. Alternatively, the parties may stipulate to a prejudgment interest rate for the Court's approval. *See, e.g.*, Order Directing Entry of Amended Final Judgment, *USA Fanter Corp. Inc. v. Imperial Pacific International (CNMI), LLC*, Case No. 1:20-cv-00003 (D. N. Mar. I. May 4, 2021), ECF No. 103.

Additionally, Unicorn seeks post judgment interest at nine (9) percent per year, the default rate provided for under CNMI law. *See* 7 CMC § 4101. However, post judgment interest in this Court is governed by federal law. *AT&T Co.,* 98 F.3d at 1209. Thus, nine percent per year would only be permitted if there was evidence in the sublease agreement or evidence of an express agreement elsewhere to specifically apply a post interest judgment rate at nine percent; otherwise, the federal statutory rate mandated by 28 U.S.C. § 1961 applies. *See Fidelity Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004) ("An exception to § 1961 exists when the parties contractually agree to waive its application."); *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1107-08 (9th Cir. 1998) (concluding that the parties contractually waived their right to have post judgment interest calculated at the federal statutory rate where the parties stipulated to a ten-percent interest rate "to the date of entry of judgment *and, after judgment until collection*." (internal quotation marks omitted) (emphasis in original)); *cf. Oreo Corp. v. Winnerman*, 642 F.App'x 751, 755 (9th Cir. 2016) (concluding that the district court abused its discretion in awarding post-interest judgment at the parties' contractual rate when there was no "specific agreement" on the specific issue of post judgment interest).

Because the sublease agreement contains no express provision permitting a nine percent post judgment interest rate, and Unicorn has failed to provide sufficient proof of an express agreement elsewhere, Unicorn is not entitled to its requested post judgment interest at nine percent per year. Rather, the federal statutory rate applies.

## V. CONCLUSION

For the reasons set forth above, the Court GRANTS Unicorn's motion for entry of default judgment, but for the lesser amount of **$1,712,082**, plus attorney's fees and cost, plus post judgment interest at the applicable federal rate. The Court therefore directs the Clerk to: (1) enter default judgment in favor of Plaintiff Unicorn Corporation and against Defendant Forson Holdings (CNMI), LLC in the amount of **$1,712,082**, plus the applicable federal interest rate for post judgment interest on the date of this order, to wit 0.98%, plus attorney's fees and costs.

Unicorn is ordered to submit a separate petition for its attorney's fees and costs. As to prejudgment interest, if Unicorn is seeking prejudgment interest, it must submit a stipulation or supplemental briefing establishing its entitlement to prejudgment interest at a specified rate.

IT IS SO ORDERED this 18th day of February, 2022.

RAMONA V. MANGLONA
Chief Judge